**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SIMON LAU, : | |
| : | Civ. No. 10-5030 (SRC) |
| Petitioner, : | |
| : | |
| v. : | **OPINION** |
| : | |
| GREG BARTOWSKI, et al., : | |
| : | |
| Respondents. : | |
| : | |

**CHESLER, DISTRICT JUDGE:**

### I.    INTRODUCTION

Before this Court is the Petition for a writ of habeas corpus of Petitioner Simon Lau ("Petitioner"), brought pursuant to 28 U.S.C. § 2254. (ECF No. 1). For the following reasons, the Court denies the Petition, and declines to issue a certificate of appealability.

### II.    BACKGROUND

Petitioner, along with his six co-defendants, was convicted of four counts of purposeful and knowing murder, two counts of attempted murder, five counts of felony murder, two counts of kidnapping, one count of burglary, one count of attempted arson, and various weapons offenses. (ECF No. 17-3 at 3–4.) Petitioner received an aggregate sentence of four life terms plus forty years, with 140 years of parole ineligibility. Id. The following factual background is taken from the New Jersey Supreme Court's opinion, affirming the Appellate Division decision on direct appeal:[1]

---

[1]    The Appellate Division, on direct appeal, had previously consolidated six appeals of the co-defendants.

1

Defendants are members of a Chinese gang known as Fuk Ching. The gang's activities included extortion, arson, and loan sharking. At the time of the murders the gang derived profits from smuggling illegal Chinese aliens into the United States. The immigrants purportedly paid between $20,000 and $30,000 for transportation and were required to pay back approximately $1,000 a month to the gang. Many, if not most, of the immigrants took low-paying jobs and were forced to live as cheaply as possible, often in gang-run "safe houses." If the immigrants did not repay the debt, they were held captive and sometimes beaten. Some aliens became involved in the gang's criminal activities.

In furtherance of the gang's operations, a ship carrying hundreds of illegal Chinese immigrants was due to arrive off the coast of Massachusetts in 1993. Rival members within the Fuk Ching gang decided that they would kill the gang's leader and other high-ranking members and thereby take control of those expected immigrants. On May 24, 1993, the rivals attempted to carry out their plan by attacking a safe house in Teaneck, New Jersey. There were four gang members and one smuggled alien living in the house, and defendants shot or stabbed all of the occupants (one occupant was actually shot outdoors as he attempted to escape harm). Four of the victims of the attack died; one victim, the alien, survived.

Having received descriptions of the getaway van seen by witnesses, the police arrested all defendants (except defendant Lau) a short time after the shooting at a roadblock near the George Washington Bridge. The police retrieved numerous weapons from defendants and the safe house, including guns, knives, handcuffs, a container of gasoline, and ammunition. The police also found blood-stained clothing in the van. Defendant Lau, who had fled the murder scene in a separate vehicle, was arrested sometime later in Florida and extradited to New Jersey. Defendants were indicted on numerous counts of murder, attempted murder, felony murder, kidnapping, burglary, attempted arson, and various weapons offenses.

State v. Zhu, 761 A.2d 523, 524–25 (N.J. 2000).

    The Court also relies on the facts as set forth in the opinion of the Superior Court of New Jersey, Appellate Division, affirming the denial of PCR:

At some point, there was a falling out between Fuk Ching's leader, Ah Kay, and another gang member, co-defendant Xin Dan Lin. As a result, Ah Kay ordered the killing of Xin Dan Lin. Two gang members were killed in New York, but Xin Dan Lin managed to escape when the gun held to his head jammed. Ah Kay decided to hide out. He left his brother Ah Wong in charge of the gang and a safe house on Somerset Road in Teaneck. Ah Wong lived in the house and was responsible for handling all arrangements there. At the time of the murders, there were four gang members living in the house along with one of the smuggled aliens. It was Ah Wong and these four gang members who became defendants' victims on the evening of May 24, 1993. The alien, Lin Ling Chang, was the only survivor. He identified defendants Xin Dan Lin, Yun Lin, Chao Lin Feng, and Cho Lee Lin as among those who committed the murders and who attempted to murder him.

According to Lin Ling Chang, earlier in the day, three of the four resident gang members had left the house, leaving one gang member, Liang Qun Guo (also a brother of Ah Kay), with Lin Ling Chang. While Lin Ling Chang was in the kitchen, he heard the doorbell ring. Liang Qun Guo went to the door and moments later a number of people entered the kitchen. One of the defendants pointed a gun at Lin Ling Chang's head. Liang Qun Guo started to fight with the intruders. Gunshots were fired. Both Lin Ling Chang and Liang Qun Guo were shot. They were dragged to the basement, tied, and duct taped.

On the evening of May 24, 1993, Ming Cheng, a member of Fuk Ching and Ah Wong's bodyguard, drove from New York to Teaneck with Ah Wong and two other gang members, Yu Ping Zhang and Guang Sheng Li. Upon their arrival, they found the house locked, and no one answered the doorbell. Yu Ping Zhang and Guang Sheng Li gained entrance to the house through a window in the back. Ming Cheng went to the front door. He was not aware of how Guang Sheng Li got inside the house.

After Ming Cheng and Ah Wong had returned to the front door, the door opened and Ming Cheng heard a gunshot. He pushed the door open and saw Xin Dan Lin with a gun and several other persons on the stairs inside. He warned Ah Wong and they both ran, but in opposite directions. Ming Cheng ran two or three blocks and hid in some bushes. He saw Ah Wong lying on the ground with three people standing over him and then heard some gunshots.

3

> Alan Tam, one of the main witnesses against defendants, was a member of the Fuk Ching. He pled guilty in federal court to charges related to the killings and agreed to testify at this trial. Alan Tam testified that in early April 1993, he spent several days at an apartment in Brooklyn where Simon Lau, Chao Lin Feng, and Jeffrey Zhu attempted to recruit him to participate in the murder of Ah Wong. The motivation behind this plot was to gain control of the alien smuggling business and to strike back for the attempted killing of Xin Dan Lin. Alan Tam met with Ah Wong four days before the killing. He did not warn Ah Wong of the murder plot against him.
>
> Tu Wei Chung was also a member of the Fuk Ching gang. Like Tam, he testified for the State pursuant to a plea agreement on federal charges. He corroborated Tam's testimony.

State v. Cho Lee Lin, et al., Indictment No. 94-06-0644, 2010 WL 1330272, *1–2 (N.J. Super. Ct. Appellate Division, April 6, 2010).

Petitioner appealed his conviction and sentence and the Appellate Division affirmed the conviction on April 5, 1999, but remanded for issues related to sentencing. (ECF No. 17-3.) On October 4, 2000, the trial court entered an amended judgment of conviction, pursuant to the Appellate Division decision. (ECF No.17-8 at 63.) The Supreme Court of New Jersey granted certification on the narrow issue of courtroom security, and on October 23, 2000, the New Jersey Supreme Court affirmed the decision of the Appellate Division on that issue. Zhu, 761 A.2d 523. Petitioner filed a petition for post-conviction relief ("PCR"), which was denied by the PCR court on June 1, 2006. (ECF No. 17-8 at 85.) Petitioner appealed, and the Appellate Division, consolidating the appeals of Petitioner and his co-defendants, affirmed the denial of PCR on April 6, 2010. (ECF No. 17-11.) The Supreme Court of New Jersey denied certification on June 30, 2010. State v. Lau, 999 A.2d 461 (N.J. 2010). Petitioner then filed a habeas petition with this Court, executed on September 23, 2010. (ECF No. 1.) The Petition raises many identical claims

to those raised by five of his co-defendants in their respective habeas petitions, which were all denied on the merits by the Court.  See Chao Lin Fang v. Bartkowski, No. 10-5031, 2012 WL 503652 (D.N.J. Feb. 15, 2012); Yun Lin v. Bartkowski, No. 10-5489, 2012 WL 3124493 (D.N.J. Aug. 1, 2012); Zhu v. Bartkowski, No. 10-4447, 2012 WL 3201921 (D.N.J. Aug. 1, 2012); Cho Lee Lin v. Bartkowski, No. 10-5502, 2012 WL 3201943 (D.N.J. Aug. 1, 2012); Xin Dan Lin v. Bartkowski, No. 10-5491 (D.N.J. Aug. 1, 2012).

Petitioner raises eight grounds for habeas relief:

1. Petitioner's rights to due process and an impartial jury as guaranteed by the United States Constitution, Amendments Sixth and Fourteenth were violated due to [the] trial court's inadequate *voir dire* and deprivation of Petitioner's statutory rights to intelligently challenge jurors for cause and exercise peremptory challenges.

   a. The jury selection procedures employed by the trial court resulted in impermissibly cursory jury *voir dire*.

2. The trial court committed reversible error by denying Petitioner's motion to *voir dire* the jury regarding published prejudicial information, thereby violating Petitioner's right to be tried by a fair and impartial jury as guarantee[d] by [the] Sixth and Fourteenth Amendments of the United States Constitution and that of the New Jersey Constitution, 1947 Ar[t]. 1, Par. 10.

3. The trial court erred by allowing the proceedings to be conducted in such a manner as to deprive defendant of his right to a fair trial when the trial court consistently permitted sheriff['s] officers to act in such a manner as to give the jury the perception that the defendant was guilty.

4. The trial judge erred by not granting the motion for a mistrial based on the failure of the state to provide complete discovery following the disclosure that detective Cox had prepared two allegedly "original" police reports concerning ballistic findings.

5. The state's suppression of favorable evidence to defendant and knowing use of perjured testimony is a violation of the rules of discovery and prosecutorial misconduct, thereby violating defendant's right to a fair trial and due process rights secured by the United States Constitution and the New Jersey Constitution.

a. The state's suppression of police report evidence which was favorable and exculpatory was a violation of the rules of discovery, prosecutorial misconduct and a denial of defendant's right to a fair trial.

6. Petitioner was deprived of effective assistance of trial counsel when counsel failed to exercise peremptory challenges to strike jurors, D.R., E.O.B. and A.R. [which] deprived Petitioner the right to effective assistance of counsel, Due Process of law, and a fair and impartial jury under the U.S. Constitution Amends, V, VI & XIV; N.J. Const. (1947) Art. I, Pars. 1, 9, 10.

7. The defendant was denied his right to the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution and Article 1 Paragraph 10 of the New Jersey Constitution.

a. Trial counsel failed to introduce the exculpatory statement contained in Detective Michael B. Danyo's Affidavit for an application of a search warrant.

b. Trial counsel's failure to object[] to the prosecutor's erroneous statement regarding accomplice liability resulted in the court's re-affirmance of said erroneous instruction to the jury.

c. Trial counsel's failure to challenge the illegal first search of the Brooklyn apartment resulted in the admission of illegally obtained evidence.

d. Trial counsel failed to move that defendant's trial be severed from his codefendant's trial.

e. Trial counsel failed to exercise peremptory challenges of bias jurors.

f. Trial counsel's failure to preserve juror questionnaires, contrary to N.J.S.A. 2B:20-12, deprived defendant of his ability to properly challenge the unconstitutional jury selection.

g. Trial counsel failed to move to have the jury sequester[ed].

h. The conduct of the sheriff's officers violated defendant's right to effective assistance of counsel, by inducing and directly contributing to many of the trial counsel's errors.

i. Defense counsel failed to investigate a blood stained piece of glass found in the underwear of one of the state's witnesses, Ah Mee Liu[.]

j. Trial counsel failed to adequately impeach the testimony of Allan Tam and Henry Tu.

8. The trial court's charge on accomplice liability which failed to adequately convey to the jury in any or all of the offense charged, the accomplice could be found guilty to a lesser degree then the principal, based on the accomplice's own individual mental state, eroded the prosecution's burden to prove guilty beyond a reasonable doubt, rendered Petitioner's trial fundamentally unfair in violation of his right to a fair trial and due process under the United States Constitution Amendments Sixth and Fourteenth. (Con[s]t. Amends VI, XIV).

(ECF No. 1 at 12–62.)

This Court ordered Respondents to file a Limited Answer, addressing only the issue of timeliness of the Petition and exhaustion of the claims in the Petition. (ECF No. 2.) Respondents submitted a Limited Answer on May 27, 2011, conceding that the Petition was timely, but stating that a number of claims were unexhausted and procedurally barred. (ECF No. 11.) Petitioner then filed a Limited Reply on July 11, 2011, arguing those claims were not procedurally barred. (ECF No. 15.) On July 20, 2011, the Court ordered Respondents to file a Supplemental Answer. (ECF No. 16.) Respondents submitted a Supplemental Answer on August 12, 2011, in which they argue that Grounds One and Five are procedurally barred from habeas review, and the remaining claims lack merit. (ECF No. 17.) Petitioner filed a Reply on August 28, 2011, in which he argues, among other things, that his claims are not procedurally barred. (ECF No. 18.)

### III.   <u>LEGAL STANDARD</u>

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. See <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013); <u>see also</u> <u>Parker v. Matthews</u>, 567 U.S. 37, 40–41 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the

determinations of the state trial and appellate courts.  See <u>Renico v. Lett</u>, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court.  See <u>Woods v. Donald</u>, 135 S. Ct. 1372, 1376 (2015).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court."  <u>Leyva v. Williams</u>, 504 F.3d 357, 365 (3d Cir. 2007) (citing <u>Stevens v. Delaware Corr. Ctr.</u>, 295 F.3d 361, 369 (3d Cir. 2002)).  This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'"  <u>Id.</u> (citing <u>United States v. Bendolph</u>, 409 F.3d 155, 173 (3d Cir. 2005)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule.  See <u>Johnson v. Pinchak</u>, 392 F.3d 551, 556 (3d Cir. 2004).  This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment."  <u>Leyva</u>,

504 F.3d at 365–66 (citing <u>Nara v. Frank</u>, 488 F.3d 187, 196, 199 (3d Cir. 2007); <u>see also</u> <u>Gray v. Netherland</u>, 518 U.S. 152 (1996), and <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." <u>Leyva</u>, 504 F.3d at 366 (citing <u>Lines v. Larkins</u>, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). <u>See</u> <u>Taylor v. Horn</u>, 504 F.3d 416, 427 (3d Cir. 2007); <u>Bronshtein v. Horn</u>, 404 F.3d 700, 728 (3d Cir. 2005).

## IV.   <u>DISCUSSION</u>

### A.  Ground One: Jury *Voir Dire*

In Ground One, Petitioner argues his constitutional rights were violated based on the trial court's inadequate jury *voir dire*. (ECF No. 1 at 13.) He explains that prospective jurors were provided a questionnaire which the judge substantially reduced to speed-up jury selection. <u>Id.</u> at 14. He further explains that the judge interceded during *voir dire* with leading questions, spent less than a minute conducting *voir dire* on each prospective juror, and ignored counsel's objections. <u>Id.</u> at 14–19. Petitioner specifically points to the circumstances in which sitting jurors D.R, E.O., and A.R. were qualified, and argues the judge failed to properly follow-up on questionable answers in their questionnaires. <u>Id.</u> at 17–22.

The Appellate Division, on appeal from the denial of PCR, rejected this claim as procedurally barred under N.J. Ct. R. 3:22-4. (ECF No. 17-11 at 9–10.) The Court will, nevertheless, address this claim on the merits.

9

The Sixth Amendment right to a jury trial guarantees a criminal defendant the right to a "fair trial by a panel of impartial, indifferent jurors," Irvin v. Dowd, 366 U.S. 717, 722 (1961) (internal quotation marks omitted), and that right is extended to state criminal trials through the Due Process Clause of the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 148–49 (1968). "An impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts." Lockhart v. McCree, 476 U.S. 162, 163 (1986); see also United States v. Tindal, 357 F. App'x 436, 438 (3d Cir. 2009) (explaining that "[j]urors are presumed to be impartial"). Further, the Supreme Court has explained that "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire*[,]" instead, "[j]ury selection, we have repeatedly emphasized, is particularly within the province of the trial judge." Skilling v. United States, 561 U.S. 358, 386 (2010) (internal citations and quotations omitted). To violate the Sixth Amendment, it does not suffice that the trial court failed to ask questions during *voir dire* that "might be useful"; rather, the "trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." Id. at 387 n.20.

The Court, having reviewed the excerpts of *voir dire* with respect to jurors D.R, E.O., and A.R., as well as the provided copies of their questionnaires, cannot say that the *voir dire* rendered the trial fundamentally unfair.[2] Juror D.R. indicated on the questionnaire that she had read or heard of the case previously, and during *voir dire*, she testified: "I really don't know" and "I don't know" in response to questioning related to giving the testimony of law enforcement the same weight as other witnesses. (ECF No. 17-8 at 100–02). With further prompting by the judge, she

---

[2]     For citations to the trial transcript, this Court will refer to the docket of Petitioner's co-defendant, Xin Dan Lin, Civ. No. 10-5491 (DMC), in which Respondents attached the trial transcripts to their response to Xin Dan Lin's habeas petition. When citing to the docket of Xin Dan Lin, this Court will place "Lin, 10-5491", preceding the citation.

ultimately agreed she could treat all witnesses the same.[3]  (Id. at 101.)  Counsel sought to remove

her and the judge denied the request.   Juror E.O. was questioned after she indicated on the

questionnaire that the defendants' immigration status would affect her ability to be impartial.  (Id.

at 118.)   Again, with further prompting by the judge, she indicated that she could be fair and

impartial.[4]  (Id.)  Finally, juror A.R. stated that she had a brother who was murdered and the suspect

---

[3]       During D.R.'s *voir dire*, the following exchange took place between her and the trial court:

| Trial Court: | Now, [] do you know of any reason why you could not be a fair and impartial juror in this matter? |
|---|---|
| D.R.: | No. |
| | . . . |
| Trial Court: | Now, in this case certain law enforcement officials will be testifying. Would you tend to give their testimony and their credibility the same weight as you would other witnesses who testify, tend to give him greater weight or tend to give them lesser weight? |
| D.R.: | I really don't know. |
| | . . . |
| Trial Court: | But can you treat him [law enforcement] the same as you would any other witness until after the testimony comes in until you have to pick and choose as to who you believe or don't believe and where the facts lie? |
| D.R.: | I don't know.  I've never -- I don't know. |
| Trial Court: | The question is, can you understand -- |
| D.R.: | I understand what you're asking.  I guess I would have to be in that situation. |
| Trial Court: | Well, right now, so when this witness comes on and can you treat all of those witnesses the same way and decide in weighing their testimony, determine their credibility? |
| D.R.: | I would hope so. |
| Trial Court: | And you believe you can do so? |
| D.R.: | I think so. |

(ECF No. 17-8, at 100–02.)

[4]       The exchange between the trial court and juror E.O. went as follows:

| Trial Court: | Miss O'Brien, do you know of any reason why you could not be a fair and impartial juror in this matter? |
|---|---|
| E.O.: | No, except there was one question there. |
| Trial Court: | What was that? |
| E.O.: | About the legal. |
| Trial Court: | The illegal immigrants? |

was an illegal alien, but she also indicated that she could be impartial.[5]  (Id. at 138.)  While the judge's questioning does appear somewhat leading, the Court does not find the error to be of constitutional magnitude so as to render the trial fundamentally unfair.  See Skilling, supra, 561 U.S. 387 n.20.  The judge also instructed the jury, on more than one occasion, of their responsibility to assess the evidence without bias or prejudice.  (See, e.g., Lin, 10-5491, ECF 12-33 at 21.)  Accordingly, while it may have been helpful for the judge to conduct more extensive *voir dire*, the

---

| | |
|---|---|
| E.O.: | Yes. |
| Trial Court: | And that would affect your· ability to be fair and impartial? |
| E.O.: | Yes. |
| Trial Court: | In what way? |
| E.O.: | Just it denotes it is illegal and I don't believe people should come into the country illegally. |
| Trial Court: | I don't think anybody could argue that position.  The question is, would that fact affect your ability to be fair and impartial about these charges? |
| E.O.: | No. |
| Trial Court: | You could decide these charges based upon what you hear in this courtroom? |
| E.O.: | Yes. |

(ECF No. 17-28 at 117–18.)

[5]    The exchange between the trial court and A.R. went as follows:

| | |
|---|---|
| A.R.: | Okay.  There was something on the questionnaire about illegal aliens. |
| Trial Court: | Right.  There may be some testimony that some of the defendants are illegal immigrants or illegal aliens , certain terms are used.  Would that affect your ability to be fair and impartial . . .? |
| A.R.: | I don't think that it would affect my ability to decide the guilt or innocence, but I need to let you know that a brother of mine was murdered in August of '94, and they do have a suspect and he is an illegal alien, I do not know that much about the case because he was residing in California . . . |
| Trial Court: | Okay.  You advised us of that.  That wouldn't affect your ability to decide whether each one of these defendants is guilty or innocent? |
| A.R.: | No, because I don't plan to get involved in that case at all. |

(ECF No. 17-8 at 138.)

Court is satisfied that the *voir dire* was adequate to ensure the impartiality of the jurors.  Therefore, this claim is denied.

## B.  Ground Two: Media Coverage

In Ground Two, Petitioner states that the trial court failed to properly *voir dire* the jurors regarding improper media influence.  (ECF No. 1 at 24.)  He explains that there were numerous "lurid and tabloid-like" media accounts of the trial, including articles related to the weakness of defendants' case.  (Id. at 25.)

The Appellate Division, on direct appeal, first laid out the facts relating to the claim and then denied it on the merits:

> Because there had been pretrial publicity of the case, the trial judge incorporated in his jury selection questionnaire a number of questions that probed the prospective jurors' awareness of and/or exposure to such publicity and, if so, whether the publicity had led to their having formed an opinion about the case.  He also gave publicity-related warnings during the selection process and periodically throughout the trial.
>
> During the selection process, an article appeared in the local newspaper regarding a hunger strike defendants engaged in to protest alleged abuses against them by the Sheriff's office.  The trial judge refused a request to *voir dire* the prospective jurors about the article but did, as it had previously, caution the jurors not to listen to any media accounts on TV or radio and not to read any newspaper articles regarding the case.  He specifically warned the panel about the article in that day's paper and reminded them that the case had to be decided based on the evidence presented in the courtroom, not on what was printed in a newspaper.
>
> [The court listed other instances of media coverage.]
>
> . . .
>
> [The trial judge] denied defendants' request for a mistrial but granted the alternative request to dismiss [a] juror.  During argument on the application, the prosecutor asserted, "[y]ou're just letting them win.  We started with fifteen when we should have had sixteen.  We lost one.  We're going to have one alternative now?"

13

We cannot be sure, but it may have been this comment which prompted the trial judge to state the next day, in the face of yet more publicity, "[t]here are not going to be any more jury *voir dires*."

. . .

In essence, the trial judge, though troubled by the then flood of publicity, viewed the articles, for the most part, as extraneous to the case and not containing any evidential or prejudicial material. In light of his prior admonitions to the jury concerning publicity about the case, the judge found no need to go through another round of *voir dires.* We think his reasoning for not doing so is sound and find no basis for interfering in the exercise of his discretion.

More troublesome, however, is the judge's handling of an article that appeared in the *Record* on December 5, 1995. When the jury was excused on December 4, 1995, it was not cautioned about news articles, although it had been so cautioned periodically throughout the trial. The article that appeared the next day in the *Record* was placed on pages one and five of the local section and bore the rather innocuous headline "Defense arguments begin in gang case." On page one, the article stated that two of the defendants had not presented a defense but that codefendant Zhu had called five witnesses in an attempt to show that he was "an unwitting bystander" who had left Boston in May to see a concert.

. . .

[T]he article also reported that the trial judge had determined, following a mid-trial voluntariness hearing, that the defendants' statements could be used at trial should they testify because the allegations that the police had beaten and coerced them were false.

Specifically, the article stated:

> None of the remaining three defendants is expected to take the stand in the wake of Judge William C. Meehan's decision that the statements the men gave to police could be used against them. Last week, defense attorneys had argued that the defendants were beaten and coerced by police into making those statements . . . But Monday morning, Meehan decided the accusations were false and the statements were admissible.

14

According to summaries of those statements, which likely will never be heard by the jury, four of the defendants admitted to being at the scene, but none said he killed anyone.  Dan Xin Lin said he pointed his Uzi at one of the injured victims, but that the gun failed.  Chao Lin Feng said he was offered $100,000 to participate in the revenge killings, while Jeffrey Zhu admitted he drove four of the defendants to Teaneck and had been told to go upstairs in the house to serve as a lookout.

Meanwhile, one defendant, Cho Lee Lin, said he had been held hostage in the house for a month and, when he heard the shots, crawled out a window and hid in the van.  Another, Yun Lin, said he rode in the van, but that it never stopped and he never saw any weapons or blood.

The sixth defendant, Simon Lau, who was arrested in Florida this year, never made a statement to police. A seventh suspect, Shing Chung, remains at large.

The recitation at the end of the article of defendants' police statements casts this article in a different light from all of the others. Though the statements could have become evidential, albeit with limiting instructions, they did not since defendants chose not to testify.  The December 5, 1995 article, thus, contained evidence that was never presented to the jury.  The potential for prejudicial jury taint, then, was far more serious than with the prior articles. Nonetheless, the trial judge did no more than state "I'm not going to do anything on it.  When the jury comes in . . .I will remind them to make sure they don't read any articles on it. . . ."

. . .

A defendant's right to be protected from prejudicial trial publicity arises from the State and federal constitutional right to a fair and impartial jury.  U.S. Const. amends. VI, XIV; N.J. Const. of 1947, art. I, para. 10.  See, e.g., Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751, 755 (1961); State v. Feaster, 156 N.J. 1, 50 (1998); State v. Harvey, 151 N.J. 117, 210 (1997); State v. Bey, 112 N.J. 45, 75 (1988); State v. Williams, 93 N.J. 39, 59-62 (1983).  We observe, however, that this case does not involve the type of saturated media coverage that creates a presumption of prejudice to a defendant.  See State v. Biegenwald, 106 N.J. 13, 33–35 (1987).  Neither does the record establish actual jury taint or

actual exposure to extraneous influences (such as jury misconduct or influence by outside sources) which requires a searching *voir dire* of the taint and its impact upon the jurors.  See State v. Bisaccia, N.J. Super. (1999); State v. Wormley, 305 N.J. Super. 57, 68–70 (App. Div. 1997), certif. denied, 154 N.J. 607 (1998).

Moreover, defendants are not entitled to jurors who are totally ignorant of the facts and issues of their case.  State v. Harvey, supra, 151 N.J. at 211.  As observed by the United States Supreme Court, "[i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the pubic in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case . . . [i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  Irvin v. Dowd, supra, 366 U.S. at 722-23, 81 S. Ct. at 1642–43, 6 L. Ed. 2d at 756.

On the other hand, "a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself."  State v. Williams, supra, 93 N.J. at 60.  And see Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S. Ct. 1507, 1576, 16 L. Ed. 2d 600, 613 (1966).  The trial judge, therefore, must take such action as is necessary to assure that the jurors have not become prejudiced as a result of facts which "'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'"  State v. Scherzer, 301 N.J. Super. 363, 486 (App. Div.), certif. denied, 151 N.J. 466 (1997) (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)).  "The test is 'not whether the irregular matter actually influenced the result but whether it had the capacity of doing so.'"  Scherzer, supra, 301 N.J. Super. at 486 (quoting Panko, supra, 7 N.J. at 61).

. . .

Here . . . the trial judge denied defendants' motion to *voir dire* the jurors following the December 5, 1995 article.  In doing so, he did not conduct the two-part analysis required under [State v. Bey, 112 N.J. 45 (1988)].  Indeed, he seems to have engaged in no analysis of the circumstances.  We do that now.

To begin with, we are convinced that it is only defendants' police statements that might be prejudicial should the jurors have learned of them through the news articles.  See State v. Bey, supra, 112 N.J. at 84.  And see Marshall v. United States, 360 U.S. 310, 79 S. Ct.

1171, 3 L. Ed. 2d 1250 (1959) (jurors exposure to newspaper's articles revealing defendant's prior criminal record required new trial). But reference to those statements was at the end of the article and located on a continued page. Moreover, there is no indication in the caption of the article that such information might be found therein. In addition, the statements were not per se inadmissible and would have been used by the State to impeach defendants had they testified. See State v. Bey, supra, 112 N.J. at 85 n. 25 ("[w]hen the allegedly prejudicial information, or its substantive equivalent, has been or will be admitted into evidence, the danger of actual prejudice to the accused may be greatly lessened.").

Moreover, for most of the defendants, the statements were not incompatible with the general thrust of the defense. The defense proffered at trial, generally, was that the State's evidence was suspect and that, if the jury were to conclude that they were at the scene, they were not involved in purposeful or knowing murders. We recognize that the reported statements of Chao Lin Feng and Yun Lin might seem contradictory to their trial defense in that each seemed to argue at trial that they were mistakenly identified as perpetrators, either as principle or accomplice, whereas their statements placed each at the scene. However, the statements, even if learned of by the jurors, pale in comparison to the overwhelming evidence properly presented to the jury. We cannot see how knowledge of them could have, therefore, been prejudicial.

In any event, we are satisfied the second step of the Bey analysis was not established. Unlike the situation presented in Bey where the highly prejudicial information had been the subject of repeated coverage in the press (at least five newspaper articles), 112 N.J. at 79–80, 90, the complained-of material here was published only once. It received no prominence. Indeed, as we have said, the reported statements were located in the middle of the New Jersey section of the paper at the end of an otherwise innocuous article. None of the objectionable material was even hinted at in the headline. Hence, the extent, notoriety and prominence of the media coverage afforded this material militates against a finding that a repeated publicity-warned juror was exposed to it. Compare Sheppard v. Maxwell, supra, 384 U.S. at 356–57, 86 S. Ct. at 1519, 16 L. Ed. 2d at 616–17.

We also take note of the fact that this jury seems to have rather conscientiously weighed and analyzed the evidence. The acquittals of the arson felony-murders, the kidnapping felony murders of Liang Wang Guo, Yu Ping Zhang, Guang Sheng Li, and the possession of a defaced .25 caliber Raven Arms semi-automatic

revolver, reflect that.  United States v. Faulkner, 17 F.3d 745, 764–
65 (5th Cir.), cert. denied, 513 U.S. 870, 115 S. Ct. 193, 130 L. Ed.
2d 125 (1994) (fact that jury returned mixed-verdict may be
indicative of a fair consideration of the evidence).  Cf. State v.
Bauman, 298 N.J. Super. 176, 209 (App. Div.), certif. denied, 150
N.J. 25 (1997) (fact that defendant was acquitted on three counts
indicates that defendant was not prejudiced by misconduct in
prosecutor's summation).

Therefore, while it might have been better had the trial judge
acceded to the request to *voir dire* the jurors, we are convinced the
failure to do so was not error requiring a reversal.

(ECF No. 17-3 at 15–33.)

As noted earlier in the Opinion, the Constitution provides that an accused has the right to

an impartial jury.  U.S. Const. Amend. VI.  "The theory of our [trial] system is that the conclusions

to be reached in a case will be induced only by evidence and argument in open court, and not by

any outside influence, whether of private talk or public print."  Skilling, 561 U.S. at 378 (internal

citation and quotations omitted).  Nevertheless, Supreme Court case law "cannot be made to stand

for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively

deprives the defendant of due process.  Prominence does not necessarily produce prejudice, and

juror *impartiality*, we have reiterated, does not require ignorance."  Id. at 380–81 (internal citation

and quotations omitted) (emphasis in original).  See also Dowd, 366 U.S. at 722 ("It is not required,

however, that the jurors be totally ignorant of the facts and issues involved . . . scarcely any of

those best qualified to serve as jurors will not have formed some impression or opinion as to the

merits of the case").

The Supreme Court has explained that where pretrial publicity is at issue, "primary reliance

on the judgment of the trial court makes good sense . . . [because] the judge of that court sits in the

locale where the publicity is said to have had its effect and brings to his evaluation . . . his own

perception of the depth and extent of news stories that might influence a juror."  Mu'Min v.

Virginia, 500 U.S. 415, 427 (1991).  Mid-trial-publicity can render a trial fundamentally unfair, where the "proceedings . . . [are] entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness".  Murphy v. Florida, 421 U.S. 794, 799 (1975).  See, e.g., Estes v. Texas, 381 U.S. 532, 535 (1965) (finding defendant's due process rights were violated where his trial was conducted in a circus-like atmosphere); Sheppard v. Maxwell, 384 U.S. 333, 355 (1966) (finding defendant was deprived of a fair trial where "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially [defendant].").

The state court's rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court precedent.  First, as the state court notes, the pre-trial questionnaire incorporated questions to determine the prospective juror's exposure to media and trial publicity, and the jurors, during *voir dire*, expressed that they could be fair and impartial.  Second, the record reflects that the judge warned the jurors, on multiple occasions, to avoid trial publicity.  (See, e.g., Lin, 10-5491, ECF Nos. 12-24 at 5, 12-28 at 8, 12-33 at 18); see also Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions"); compare Sheppard, 384 U.S. at 353 (in which "the judge simply repeated his 'suggestions' and 'requests' that the jurors not expose themselves to comment upon the case.").

In Petitioner's reply brief, he relies on Sheppard, which he claims is "materially indistinguishable" from the circumstances surrounding his trial.  (ECF No. 18 at 18–19.)  The Court previously denied the identical claim when raised by Petitioner's co-defendant and this Court agrees with that analysis.  The Court explained there:

> Sheppard was a § 2254 case brought by Dr. Sam Sheppard who was indicted for murdering his wife and who faced the death penalty. The Supreme Court ruled that the pretrial and trial publicity deprived Sheppard of a fair trial.  However, Sheppard is factually

distinguishable, in that Sheppard faced the death penalty; the judge merely requested or suggested that the jury refrain from reading, watching or listening to reports about the case; the judge allowed the newspapers to publish the names and addresses of jurors, who were bombarded with press and letters; three months before trial, a public inquest was televised, where Sheppard was examined for five hours without counsel and the inquest "ended in a public brawl," id. at 354; the trial began two weeks before a hotly contested election at which both the Chief Prosecutor and the judge were candidates for judgeships; "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," id. at 355, and a press table was set up inside the bar; "[p]articipants in the trial, including the jury, were forced to run a ga[u]ntlet of reporters and photographers each time they entered or left the courtroom," id.; and

> [m]uch of the material printed or broadcast during the trial was never heard from the witness stand, such as the charges that Sheppard had purposely impeded the murder investigation and must be guilty since he had hired a prominent criminal lawyer; that Sheppard was a perjurer; that he had sexual relations with numerous women; that his slain wife had characterized him as a "Jekyll–Hyde"; that he was "a barefaced liar" because of his testimony as to police treatment; and finally that a woman convict claimed Sheppard to be the father of her illegitimate child. As the trial progressed, the newspapers summarized and interpreted the evidence, devoting particular attention to the material that incriminated Sheppard, and often drew unwarranted inferences from testimony. At one point, a front-page picture of Mrs. Sheppard's blood-stained pillow was published after being 'doctored' to show more clearly an alleged imprint of a surgical instrument. Id. at 356–57.

The facts in this case regarding prejudicial publicity pales in comparison to the media circus that occurred in and outside the courtroom in Sheppard. Moreover, the daily assault of media and press coverage with highly prejudicial and non-evidentiary, inflammatory information, to the point that even jurors were included in the media scrutiny, is factually distinguishable from this case.

Zhu, 2012 WL 3201921, at *20–21.

20

Here, while there were multiple articles published about the trial, the judge's instructions regarding media influence, coupled with the fact that the articles appeared only sporadically, demonstrate that these facts simply do not rise to the level of those in <u>Sheppard</u>.  Because the state court's rejection of this claim does not violate clearly established federal law, nor was it an unreasonable application of Supreme Court precedent, this claim is denied.

## C.  Ground Three: Courtroom Security

In Ground Three, Petitioner argues that the excessive security measures enacted by the Bergen County Sherriff's Office during trial gave the jury the impression that Petitioner and his co-defendants were guilty.  (ECF No. 1 at 27.)  In support of his claim, he asserts, among other things, that officers stood directly behind each defendant throughout the trial, defense counsels' briefcases and notes were searched, the defendants were woken up at 5:00 a.m. for court appearances, were strip-searched and verbally and physically assaulted by sheriff's officers, and the jury was not permitted to walk directly to and from the jury box.  (Id. at 27-32.)  The New Jersey Supreme Court first laid out the facts surrounding the claim, and then affirmed the decision of the Appellate Division, explaining:

> Against the background of the indictment and the gang's alleged internecine rivalries, the Bergen County Sheriff's Office proposed certain high-security procedures to be implemented at trial.  Frank Benedetto, a captain with that office, outlined the procedures in a May 8, 1995, memorandum to the Sheriff[:]
>
> . . .
>
>> The Bergen County Sheriff's Department's standard operating procedure for high security trials will be implemented in reference to the State of New Jersey vs. [Jeffrey Zhu, et al.] trial.
>>
>> A supervising officer will be assigned to oversee the security detail.  An appropriate amount of officers will be assigned to address all participants, the judge,

the jury, defendants, defense attorneys, the prosecutor and the general public.

. . .

The courtroom in question will be searched on a daily basis prior to its opening, [and] it will be closed and locked during lunch.  All participants, including the general public will have to pass through mangetometer-type [sic] searches.  All packages and briefcases will have to be opened for examination.

. . .

On May 22, 1995, the trial court conducted a hearing during which defense counsel questioned Captain Benedetto regarding the proposed plan.

. . .

Captain Benedetto explained that the heightened security plan was necessary because: first, the Sheriff's Office believed that an organized criminal group had threatened the lives of one or more defendants; second, there was a possibility that a family member of the judge, his staff, or the jurors might be held hostage and a family member of that hostage would be compelled to smuggle a weapon into the courtroom in exchange for the hostage's safety; and third, it might be possible for someone to bypass the security checkpoints at the two main entrances because of the large number of other entrances to the courthouse.

. . .

The United States Supreme Court has held that the deployment of security personnel in a courtroom is not inherently prejudicial. Holbrook v. Flynn, 475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).  In Holbrook, four uniformed state troopers sat in the front row of the spectators' section of the courtroom to supplement the customary security force (six defendants were on trial in Holbrook; only one defendant appealed).  Id. at 562, 106 S. Ct. at 1342, 89 L. Ed. 2d at 530.  The jurors' responses to *voir dire* indicated that the presence of the four troopers would not affect the defendants' ability to receive a fair trial.  Id. at 565, 106 S. Ct. at 1344, 89 L. Ed. 2d at 532. The Supreme Court upheld the defendant's conviction, concluding that "conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is [not] the sort of

22

inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." Id. at 568-69, 106 S. Ct. at 1345–46, 89 L. Ed. 2d at 534.   Writing for the Court, Justice Marshall articulated the appropriate inquiry whenever a courtroom arrangement is challenged as inherently prejudicial: "[W]hether 'an unacceptable risk is presented of impermissible factors coming into play[.]'" Id. at 570, 106 S. Ct. at 1346–47, 89 L. Ed. 2d at 535 (citation omitted).

Defendants argue that the Holbrook standard has been satisfied here, namely, that the heightened security plan posed an unacceptable risk that impermissible factors prejudiced the jury.  Defendants further contend that the trial court abdicated its responsibility by surrendering control of the courtroom to the Sheriff.  Additionally, defendants assert that numerous confrontations between Sheriff's officers and defense counsel contributed to an unacceptable trial atmosphere and impermissibly infringed on their right to counsel. The State counters by asserting that the trial court's decision permitting the enhanced security plan constituted an exercise of sound discretion and did not deny defendants a fair trial.

We conclude that the security plan did not pose an unacceptable risk of unfairness.  Holbrook, supra, 475 U.S. at 570, 106 S. Ct. at 1346–47, 89 L. Ed. 2d at 535.  Our reasons are similar to those noted by the Appellate Division:

First, at no time was a finding made, or an accusation brought, that extra security measures were needed because of the conduct, character, or prior record of the defendants.  Nothing was presented to the jury that would have led to this conclusion.  That is, the extra security was needed purportedly to protect defendants, and everyone else involved in the trial, from threats from outside parties-not to protect anyone from the defendants.  Nothing ever occurred during trial that would have caused the jury to conclude otherwise.  Second, all prospective jurors were asked in their questionnaires whether they understood that increased security measures, including the search of all persons entering the courtroom, had nothing to do with the guilt or innocence of defendants.   Third, the patent, and unacceptable, hostility displayed towards the defense attorneys was, for the most part, out of the presence of the jury, and not in the courtroom itself.

. . .

Common experience informs us that citizens have become accustomed to the presence of security personnel in most public

places, including schools.  Members of the public pass through metal detectors and have their bags inspected at airports, courthouses, and elsewhere as part of the everyday precautions now tolerated in a free society.  Such common practices help prevent jurors from drawing any undue inferences at the sight of similar security measures in a courthouse setting.  See Holbrook, supra, 475 U.S. at 569, 106 S. Ct. at 1346, 89 L. Ed. 2d at 535 (observing, "[i]ndeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards").  We are thus satisfied that implementation of the security plan in this case was not inherently suggestive of defendants' guilt and that the presumption of innocence was not lost.

. . .

Accordingly, we hold that the heightened security measures in this case did not deprive defendants of a fair trial before an impartial jury.  Even if we assume some slight error on the part of the trial court in the manner in which the security plan was adopted and implemented, or by the court's failure to deliver an unsolicited cautionary charge to reinforce the *voir dire*, such error was not clearly capable of contributing to the verdict in view of the overwhelming evidence of defendants' guilt.  State v. Loftin, 146 N.J. 295, 397, 680 A.2d 677 (1996).

Zhu, 761 A.2d at 525–30.

In certain circumstances, security measures can interfere with a criminal defendant's ability to receive a fair trial.

In Illinois v. Allen, 397 U.S. 337 (1970), the Supreme Court recognized that requiring a criminal defendant to appear in shackles before a jury may result in an unfair trial.  As the Allen Court explained, "[n]ot only is it possible that the sight of shackles . . . might have a significant effect on the jury's feelings about the defendant, but the use of th[e] technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold."  Id. at 344.  Because shackling a defendant during trial is an "inherently prejudicial practice," it "should be permitted only where justified by an essential state interest specific to each trial."  Holbrook v. Flynn, 475 U.S. 560, 568–69 (1986); see also Deck v. Missouri, 544 U.S. 622, 633 (2005) (noting that the appearance of a criminal defendant in shackles "almost inevitably affects adversely the jury's perception of the character of the defendant").

24

Sides v. Cherry, 609 F.3d 576, 580–81 (3d Cir. 2010).  In Estelle v. Williams, 425 U.S. 501, 506

(1976), the Supreme Court held that requiring a defendant to wear "identifiable prison clothes"

violated his due process right to a fair trial.  The Court explained: "The constant reminder of the

accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment.

The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an

unacceptable risk is presented of impermissible factors coming into play."  Id. at 504–05.  In

contrast, in Holbrook, the Supreme Court held that the defendant's right to Due Process was not

violated by the presence of uniformed state troopers in the first row of the spectator section of the

courtroom.  475 U.S. 560.  The Holbrook Court explained that while "the sight of a security force

within the courtroom might under certain conditions create the impression in the minds of the jury

that the defendant is dangerous or untrustworthy," it refused to find that the presence of security

guards in the courtroom was inherently prejudicial.   475 U.S. at 569 (quotation omitted).

Moreover, the Supreme Court stressed its unwillingness to make unwarranted assumptions about

how a jury would interpret police presence in the courtroom: "[T]he presence of guards at a

defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable.

Jurors may just as easily believe that the officers are there to guard against disruptions emanating

from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into

violence."  Id. at 569.

Here, the state court correctly identified Holbrook as the governing Supreme Court

precedent, and reasonably applied it to the facts.  With respect to the officers standing near the

defendants, Petitioner has failed to demonstrate that this security measure is inherently prejudicial.

See Holbrook, supra, 475 U.S. at 469; see also Sutton v. Bell, 645 F.3d 752, 756 (6th Cir. 2011)

(finding that security measures consisting of four officers standing behind the defense table, one

officer standing next to the jury, two officers standing in the balcony, and one officer at each of the courtroom's doors was not unconstitutional under <u>Holbrook</u>).  Nor can this Court say that the metal detectors and searches of the attorneys and their briefcases was enough to deem the trial prejudicial.  As explained in <u>Holbrook</u>, our society has become "inured" to security measures.  475 U.S. at 469.  Therefore, while recognizing the discomfort that resulted from the increased security measures, the Court does not find that the state court's determination was an unreasonable application of <u>Holbrook</u>.[6]  Therefore, Petitioner is denied relief on this claim.

**D.  Ground Four: Failure to Disclose Evidence**

In Ground Four, Petitioner asserts that the trial court erred in failing to grant a motion for a mistrial based on the State's failure to disclose evidence consisting of two versions of a police report signed by Detective Cox, which was only discovered at trial.  One report stated a bullet was found in the pocket of one of Petitioner's co-defendants, and an earlier report made no mention of the bullet.  (ECF No. 1 at 34.)  He further explains that the court dismissed the error without further inquiry.  (<u>Id.</u> at 35.)  The Appellate Division, on direct appeal, rejected the claim without extended discussion.  (<u>See</u> ECF No. 17-3 at 6.)

Petitioner's claim appears to implicate his rights under <u>Brady v. Maryland</u>, 373 U.S. 83 (1967).  Under <u>Brady</u>, the State bears an "affirmative duty to disclose [material] evidence favorable to a defendant."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 432 (1995) (citing <u>Brady</u>, 373 U.S. 83.) "[E]vidence is material only if there is a reasonable probability that, had the evidence been

---

[6]    To the extent Petitioner is also seeking relief from alleged abuse by prison guards, this claim is not cognizable under 28 U.S.C. § 2254.  <u>See</u> <u>Heck v. Humphrey</u>, 512 U.S. 477, 481 (1994) ("habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release"); <u>Docken v. Chase</u>, 393 F.3d 1024, 1026 (9th Cir. 2004) ("Traditionally, challenges to prison conditions have been cognizable only via [42 U.S.C.] § 1983, while challenges implicating the fact or duration of confinement must be brought through a habeas petition.").

disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). In Strickler v. Greene, the Supreme Court clarified that "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281–82 (1999).

Here, only the earlier report, which did not mention the bullet being found, was provided to the defense. It was only during cross-examination of Detective Cox that the second report, which mentioned the bullet, was revealed. (Lin, 10-5491, ECF No. 12-73 at 53.) It cannot be argued that finding a bullet on one of the co-defendants amounts to exculpatory evidence. Thus, Petitioner's argument must be that failure to disclose the report prevented him from sufficiently impeaching Detective Cox. This however, is belied by the record. After the discrepancy in the reports were revealed, the defense proceeded to vigorously impeach Detective Cox, by asking about various alterations in the reports, changes in the signature on the reports, and added sentences. (See Lin, 10-5491, ECF No. 12-37 at 51–58, 81–94.) Beyond that, reviewing Petitioner's brief on direct appeal, as well as his allegations in the instant Petition, he has failed to present any facts or reasoning to support his allegation that the outcome of the case would have been altered by the second report. See Bagley, supra, 473 U.S. at 682. The Court simply cannot invent those reasons for him. Therefore, this claim for habeas relief must be denied.

### E.  Ground Five: Prosecutorial Misconduct

In Ground Five, Petitioner argues that his due process rights were violated by the prosecutor's use of perjured testimony and failure to disclose exculpatory evidence. (ECF No. 1 at 36–37.) While Petitioner's claim is not a model of clarity, he appears to argue that the prosecutor

failed to disclose evidence of agreements entered between the federal government and three of the State's witnesses, Alan Tam, Henry Tu (also referred to as Tu Wei Chung) and Ming Cheng, in exchange for their testimony. (Id.). He further states that the testimony of Ming Cheng, one of the State's witnesses, was known by the State to be false, but any contradicting testimony was suppressed by the State.[7] (Id. at 38.) This claim was raised, to some degree, on Petitioner's appeal from the denial of PCR. The Appellate Division, on PCR, rejected the claim finding it procedurally barred under New Jersey state law. (ECF No. 17-11 at 5.) To the extent the claim is procedurally barred, the Court finds the claim meritless.

On the first point, the Supreme Court has held that a cooperating witness's plea agreement with the prosecutors must be disclosed. See Giglio v. United States, 405 U.S. 150, 154 (1972). The Court in Giglio found a new trial was warranted where the State "failed to disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the Government." 405 U.S. at 151. Here, however, it appears that the agreements between federal prosecutors and the witnesses were, in fact, turned over to the defense. (See, e.g., Lin, 10-5491, ECF No. 12-41 at 153–158.) The record reveals that Ming Cheng was cross-examined about pleading guilty to two federal charges on which he was not yet sentenced and stated that he "agreed to help the government . . . because I was hoping by helping them . . .I would receive a lighter sentence." (Lin, 10-5491, ECF No. 12-45 at 127.) The record and cross-examination of the three witnesses reveals that the defense was in possession of the plea transcripts, and was adequately

---

[7]     Oddly, Petitioner's claim states that the testimony of Ming Cheng "caused the jury to convict Zhu", one of Petitioner's co-defendants, but Petitioner fails to mention himself. Nevertheless, construing the Petition broadly, the Court will presume Petitioner meant to include himself.

able to reveal to the jury the extent of their cooperation with the government and their involvement in the Fuk Ching gang.  Thus, this claim lacks merit.

On Petitioner's second point, the Supreme Court has held that due process is violated when "false testimony used by the State in securing the conviction . . . may have had an effect on the outcome of the trial."  Napue v. People of State of Ill., 360 U.S. 264, 272 (1959).  "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Bagley, 473 U.S. at 677 (internal citation and quotations omitted).

Here, however, Petitioner has failed to offer the Court anything but mere speculations that Ming Cheng committed perjury simply because his testimony did not include any statements supporting Petitioner's contention that the victims were the attackers.  Mere speculation that a witness for the prosecution must have lied, simply does not trigger the analysis of Napue, Brady and their progeny.  See, e.g., Delgado v. Milgram, No. 09-3728, 2011 WL 1431904, at *14 (D.N.J. Apr. 14, 2011).  As such, this claim for habeas relief is denied.

## F.  Ground Six & Seven: Ineffective Assistance of Counsel

In Grounds Six, Petitioner argues that his trial counsel was ineffective for failing to use his peremptory challenges to strike jurors D.R., E.O., and A.R.  (ECF No. 1 at 40.)  In Ground Seven, Petitioner raises ten claims of ineffective assistance of counsel, some of which appear unexhausted. (Id. at 43–53.)  Many of these claims were denied by the Appellate Division on Petitioner's appeal from the denial of PCR as "without sufficient merit to warrant a written opinion."  Cho Lee Lin, 2010 WL 1330272, at *10.  Instead, the Appellate Division, having previously cited to the standard in Strickland, stated generally:

> At the outset, we note that the State had a strong case.  There were
> two eyewitnesses to the massacre: Lin Ling Chan and Ming Cheng.

They were both familiar with all defendants. Identity was not an issue. In addition, Alan Tam and [Tu] Wai Chung, who had prior knowledge of the conspiracy, testified for the State. Against this background, defense counsel had little proof of arguments to counter the evidence against defendants. From our careful review of the record, we note that counsel vigorously participated in the trial, cross-examining witnesses and making arguments on behalf of their clients. Moreover, there was ample evidence of defendants' guilt.

. . .

In sum, following the <u>Strickland/Fritz</u> standard, our review of the record does not disclose any deficiency by any of the trial, appellate, or PCR counsels. Further, there is overwhelming evidence that defendants committed the crimes of which they were convicted. Moreover, even if we assumed that, in some respects, defense counsel's representation of any of the defendants was deficient, defendants failed to establish the defendants would have been found not guilty of the charges [i]f their attorneys had handled the matter differently.

<u>Cho Lee Lin</u>, 2010 WL 1330272, at *4.

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. See <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. <u>Id.</u> at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 687–88. To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." <u>Id.</u> at 690. The court must then determine whether, in light of all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness." <u>Hinton v. Alabama</u>, 134 S. Ct. 1081, 1088 (2014).

30

Second, a petitioner must establish that counsel's "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." Strickland, 466 U.S. at 669. To establish prejudice, the defendant must show that "there is a reasonable probability that the result of trial would have been different absent the deficient act or omission." Id. at 1083. On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard. Harrington v. Richter, 562 U.S. 86, 101 (2011).

1. **Peremptory Challenges**

Petitioner argues that his trial counsel erred in failing to use his peremptory challenges. Petitioner raised this claim on PCR and the Appellate Division rejected the claim, as indicated above. As the Court's previous discussion of the *voir dire* conducted by the trial court pointed out, jurors D.R., E.O., and A.R. verified their ability to be impartial. While Petitioner believes that he would have fared better had his counsel exercised peremptory challenges against these jurors, Petitioner offers this Court no reason to conclude so. Thus, to the extent counsel made a strategic decision not to challenge the five jurors, that decision is respected under Strickland. See Hess v. Mazurkiewicz, 135 F.3d 905, 908 (3d Cir. 1998) ("Our review of ineffective assistance of counsel claims does not permit us, with the benefit of hindsight, to engage in speculation about how the case might best have been tried. We therefore accord counsel's strategic trial decisions great deference"); Harrington, 562 U.S. at 106 ("[r]are are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach") (internal citations and quotations omitted). Thus, the state court's denial of Ground Six was not an unreasonable application of Supreme Court precedent and the claim is denied.

2. **Failure to introduce evidence**

Next, Petitioner alleges that trial counsel failed to introduce a statement contained in Detective Danyo's application for a search warrant which Petitioner argues would have revealed that the victims were in fact armed at the time of the murders.  This claim appears unexhausted. Nevertheless, the Court will deny it on the merits.

To the extent the statement would have been helpful, the underlying record provides an abundance of evidence that the victims were murdered by Petitioner and his co-defendants.  Ming Cheng testified that Petitioner (also referred to as Four Eye Fish) was in the home, and fired two shots at Ming Cheng.  (See Lin, 10-5491, ECF No. 12-45 at 63–64.)  Alan Tam and Henry Tu, provided evidence that Petitioner was actively engaged in the planning of the murders.  (See., e.g., Lin, 10-5491, ECF No. 12-52 at 109–11; ECF No. 12-56 at 20.)  Thus, Petitioner has failed to demonstrate that had the statement been admitted into evidence, there is a reasonable probability that the outcome would have been different.  Therefore, Petitioner is denied relief on this claim.

3.  **Prosecutor's Statement**.

Petitioner also argues that his trial counsel erred in failing to object to the prosecutor's statement on summation related to accomplice liability.  (ECF No. 1 at 47.)  Petitioner explains that the statement violated New Jersey case law, specifically State v. Cook, 693 A.2d 483 (N.J. Super. Ct. App. Div. 1996).

The alleged improper statement by the prosecutor reads:

> If you find that these people worked as accomplices, if they shared a common plan or a common design, if they took substantial steps to accomplish that design, to reach those goals, they're all guilty.

(Lin, 10-5491, ECF No. 12-70 at 57.)

While this claim appears unexhausted, the Court finds it meritless.  First, there is nothing to indicate that even had defense counsel objected, the judge would have ruled the prosecutor's

statement was improper.  This is because under New Jersey state law, "[b]oth the prosecutor and the defendant are allowed wide latitude in summation".  <u>State v. Perry</u>, 319 A.2d 474, 475 (N.J. 1974) (internal citation omitted).  Second, the trial court expressly instructed the jurors to follow the trial court's instruction and to ignore any conclusory statements made by either the prosecution or defense.  (See <u>Lin</u>, 10-5491, ECF No. 12-71 at 13–14.)  Thus, any possible error was remedied by the trial court' instructions.  In addition, Petitioner's reliance on <u>State v. Cook</u> misrepresents the facts addressed in that case.  In <u>Cook</u>, the ailing instructions were provided by the court, not a comment made by the prosecutor, and the ailing instructions read very differently from the prosecutorial comment referenced here.  693 A.2d at 488.  Therefore, because Petitioner has not demonstrated that he was prejudiced under <u>Strickland</u> by his attorney's alleged deficiency, the Court denies relief on this claim.

4. **Suppression of Evidence**

Petitioner next contends that his trial counsel erred in failing to move to challenge the fruit of an illegal search that took place in an apartment in Brooklyn, where the planning of the crimes took place.  (ECF No 1 at 48.)  He explains that when investigators arrived at the apartment, they failed to notify the owner that he could refuse consent to search, and he never signed a consent to search form.  (<u>Id</u>.)  Once again, this claim appears unexhausted, but the Court finds it meritless.

The record reflects that Mr. Leung was a part shareholder and overseer of the property in Brooklyn.  (<u>Lin</u>, 10-5491, ECF No. 12-13 at 10.)  During a preliminary hearing, Leung testified about the circumstances of his consent to search the apartment:

State:  Now, I'm going to ask you to refer back to June 11, 1993, and ask you what happened on that date concerning the apartment?

Leung: Two police . . . they want to go into the apartment, take a look, so I got to be, I cannot restrict them, right, so they want to go inside and take a look.

> State:   Did you allow them to take a look inside the apartment?
>
> Leung: Yeah, I allowed them to take a look because --
>
> State:   Did you have any tenant in the apartment at that time?
>
> Leung: At that time was empty.

(Lin, 10-5491, ECF No. 12-13 at 20.)

The State also questioned Sergeant Goldrick, among others, about Mr. Leung's consent to

search the apartment:

> State:   Did you ask, did you make any request of Mr. Leung when you were
>          conducting this interview on June 11, 1993?
>
> Goldrick: Yes.  We interviewed him, and at the end of the interview we asked if we
>           could, if he could consent or if we could get his consent to search the
>           apartment at 5413 Fifth Avenue.
>
> State:   And what, if any, response did you receive from Mr. Leung?
>
> Goldrick: He agreed to allow us to consent, he consented to allow us to search the
>           apartment, rather, and as a result, he escorted myself . . . to the apartment.
>
> State:   Did you have Mr. Leung sign a Consent to Search form at that time?
>
> Goldrick: No, I didn't.
>
> State:   Why not?
>
> Goldrick: I didn't have a form available with me, and he had verbally agreed to
>           allow us to consent, and also prior to that he had shown me a copy of a lease
>           which was signed on, which on May 25, 1993 had been signed by the tenant
>           giving up all of his rights to the apartment.

(Lin, 10-5491, ECF No. 12-13 at 40–41.)

The Fourth Amendment ensures "the right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.

Consent to a search is a well-recognized exception to the general requirements of both a warrant

and probable cause.  U.S. v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (citing Schneckloth v.

Bustamonte, 412 U.S. 218, 219 (1973)).  The consent given must be voluntary, id. (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)), which can be assessed based on a range of factors. Id.  "The individual giving consent must also possess the authority to do so."  Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)).  Further, [a]ctual authority for a third party to consent to an entry by police exists when the third party has common authority over a premise."  Kirley v. Williams, 330 F. App'x 16, 19 (3d Cir. 2009) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)).

As indicated in the record cited above, Leung consented to have the apartment searched, and the defendants were no longer renting the apartment.  Because Leung was both a shareholder and the landlord of the unoccupied apartment, and because Petitioner and his co-defendants' lease had ended, Leung's consent to search does not run afoul of the Constitution.  Leung certainly had common authority over the apartment at that point.  See Kirley, supra, 330 F. App'x at 19. Therefore, Petitioner has failed to demonstrate that had his counsel sought to suppress the fruits of the search, it is reasonably probable the application would have been granted.  Because this claim fails under Strickland, the Court will deny relief on this claim.

5. **Severance**

Petitioner next argues that his trial counsel erred in failing to sever his trial from his co-defendants'.  (ECF No. 1 at 49.)  Petitioner explains that because he was not arrested with his co-defendants, his situation differed, such that he was prejudiced by the joint trial.  (Id.)

The Appellate Division, in affirming the denial of PCR, rejected this claim, explaining: "[Defendant] contends that his trial attorney erred by failing to seek a severance of his case. However, there was no basis for severance.  Therefore, he has failed to meet the standard for establishing ineffective assistance."  Cho Lee Lin, 2010 WL 1330272, at *5.

The United States Supreme Court has explained that "[i]mproper joinder does not, by itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." United States v. Lane, 474 U.S. 438, 446 n.8 (1986); see also Cummings v. Evans, 161 F.3d 610, 619 (10th Cir. 1998) "[A] criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial"; Jenner v. Class, 79 F.3d 736, 741 (8th Cir. 1996) (holding that habeas relief based on the trial court's failure to grant severance is only appropriate where petitioner "can establish that the failure to grant severance rendered his trial fundamentally unfair").

The only argument raised here, and on his briefs below, is that because Petitioner came and left the crime scene in a separate vehicle, he should not have been tried with his co-defendants. There is nothing to indicate that Petitioner would have fared better in a separate trial.  Petitioner's argument is mere speculation, and without more, Petitioner has failed to show that his trial attorney's decision not to seek severance fell below an objective standard of reasonableness.  See Hess, supra, 135 F.3d at 908 (explaining that we accord counsel's trial decisions great deference.") Therefore, the state court's decision to dismiss Petitioner's challenge was not an unreasonable application of Supreme Court precedent.

6. **Failure to exercise peremptory challenges**

The Court has previously addressed and rejected this claim above.

7. **Failure to Preserve Juror Questionnaires**

Petitioner claims that his trial counsel erred in failing to seek to preserve juror questionnaires that were destroyed by the trial court, because this hindered his ability to appeal his claim of juror bias.  (ECF No. 1 at 51.)  He further explains that New Jersey state law requires that

36

such questionnaires be preserved.  (Id.)  The Appellate Court, on appeal from the denial of PCR, found the claim procedurally barred.  Cho Lee Lin, 2010 WL 1330272, at *4.  Nevertheless, putting that aside, the Court finds the claim fails on the merits.

As evidenced from the record provided, various of the questionnaires were in fact preserved, and the judge orally questioned each juror about his or her ability to be impartial.  While Petitioner may not have had access to some of the questionnaires, the impaneled jurors were all questioned on the record.  Accordingly, Petitioner was able to use the record of the individual juror *voir dires* for appeal.  Thus, Petitioner has failed to demonstrate how he was prejudiced by his attorney's failure to ensure the questionnaires were preserved.  Because Petitioner has failed to show he is entitled to relief on this claim, the Court will deny this claim.

8.   **Sequestration**

Petitioner next argues that his trial counsel erred in failing to have the jury sequestered, given the local interest in the case and notoriety of the crimes.  (ECF No. 1 at 52.)  Petitioner raised this claim on PCR and the Appellate Division denied the claim without comment.

Petitioner's claim relates to his jury *voir dire* claim, addressed above.  The juror's exposure to trial publicity was monitored by the trial court, which *voir dired* the jury and obtained the juror's verifications of their impartiality.  In light of those facts, Petitioner has failed to show that lack of sequestration prejudiced him.  Accordingly, Petitioner's position that his trial counsel violated his Sixth Amendment rights fails to meet the second prong of Strickland.  Therefore, the state court's rejection of this claim was not an unreasonable application of Supreme Court precedent, and the claim is denied.

9.   **Conduct of Sheriff's Officers**

Petitioner alleges that the excessive security measures imposed by the Sherriff's Office contributed to his counsel's inability to effectively advocate for him, because counsel was

37

intimidated to implicate Petitioner's co-defendants and chose, instead, to join forces with co-counsel. (ECF No. 1 at 52.) One again, Petitioner raised this claim on PCR, and the Appellate Division rejected the claim without comment. Petitioner does not explain, however, how implicating the co-defendants would have benefitted him in any way. Indeed, the record indicates that Petitioner and his co-defendants were in a position to win or lose together. Therefore, Petitioner has failed to demonstrate that he was prejudiced under *Strickland* by his attorney's decision to work with the rest of the defense team. Therefore, Petitioner has failed to show he is entitled to relief on this claim and the claim is denied.

10. **Failure to Investigate**

Next, Petitioner alleges that his trial counsel was ineffective for failing to investigate a blood-stained piece of glass found on Ah Mee Liu's (also referred to as Ming Cheng) underwear. He explains that Ah Mee Liu testified that he never entered the home where the murders took place, yet the blood-stained glass indicated otherwise and counsel should have investigated whose blood was on the glass, as it may have shown the witness did in fact enter the home. (ECF No. 1 at 53.) This claim, like a number of the others, appears unexhausted, as it was never raised below. Nevertheless, the Court will deny it on the merits. The record reflects that during cross-examination, Officer Hornyak read from his evidence log: "A piece of broken glass with possible blood found" and indicated that the glass fell from Ah Mee Liu's underwear. (Lin, 10-5491, ECF No. 12-43 at 42.) Petitioner's argument is simply too tenuous to demonstrate he was prejudiced by his counsel's alleged deficiencies under Strickland. He has failed to demonstrate that there is reasonable probability the outcome of the case would have been different had the glass been tested. In addition, between testimony that Petitioner was involved in the planning and execution of the murders, there was ample evidence to convict Petitioner. Thus, because the claim fails under the prejudice prong of Strickland, the claim is denied.

11. **Failure to Impeach**.

In his final claim of ineffective assistance of counsel, Petitioner argues that trial counsel failed to properly impeach the testimony of two key State witnesses, Alan Tam and Henry Tu, and failed to properly investigate their background and cooperation with the government.  (ECF No. 1 at 53.)  Petitioner raised this claim on appeal from the denial of PCR, and the Appellate Division rejected this claim, as noted above, stating only that the defense "vigorously participated in the trial, cross-examining witnesses and making arguments on behalf of their clients."  Cho Lee Lin, 2010 WL 1330272, at *4.

A failure to investigate claim commands a high degree of deference to counsel's judgments.  See Strickland, 466 U.S. at 690–91; Lewis v. Mazurkiewicz, 915 F.2d 106 (3d Cir. 1990) (expressly adopting Strickland rationale for the purposes of failure to investigate analysis). Here, the record reflects that the defense did in fact vigorously cross-examine the State witnesses and that the agreements between the federal prosecutors and Alan Tam and Henry Tu were well-known to the defense.  See, e.g., Cox v. Ricci, No. 08-2655, 2010 WL 4387504, at *3 (D.N.J. Oct. 29, 2010) (adopting state law position that a litigant must do more "than make bald assertions that he was denied the effective assistance of counsel[;] [h]e must allege facts sufficient to demonstrate counsel's alleged substandard performance" for the purposes of federal Strickland based analysis). Because the state court decision rejecting this claim does not violate clearly established federal law, the claim is denied.

## G.  Ground Eight: Improper Jury Charge

In his final ground for habeas relief, Petitioner argues that the trial court's accomplice liability charge failed to convey to the jury that an accomplice can be found guilty to a lesser degree than the principal based on the accomplice's individual mental state, and that this relieved the State

39

of its burden to prove guilt beyond a reasonable doubt.  (ECF No. 1 at 55.)  In support of his claim, he lays out the accomplice liability jury charge given, and states that it differed from the model jury charge on accomplice liability.  (Id. at 55–61.)

The Appellate Division, on direct appeal, denied this claim without comment.  (See ECF No. 17-3.)

A jury charge, even if inconsistent with state law, does not automatically warrant federal habeas relief.  "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."  Estelle, 502 U.S. at 71–72.  Instead a federal court must assess "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Id. at 72 (internal citation and quotations omitted).  A habeas petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  The Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

Petitioner points to minor differences between the recommended model instructions and the charge given.  However, this challenge does not necessarily warrant habeas relief.  See, e.g., Hackett v. Price, 381 F.3d 281, 314 (3d Cir. 2004) (a change reflected in model instructions "does not in itself indicate that its former instructions . . . were constitutionally infirm"); Berrisford v. Wood, 826 F.2d 747, 754 (8th Cir. 1987) ("[t]hough the instructions [given] differ[ed] to some degree from suggested pattern instructions used in [the State], the errors therein, if any, clearly do

not rise to the level of constitutional significance").  Indeed, the record indicates that the trial court did in fact stress to the jurors, over and over again, that the state must prove beyond a reasonable doubt each element of the offense.  The trial court also instructed that "in order to convict the defendant as an accomplice . . . [the jury] must find that the defendant had the purpose to participate in that particular crime. . . . It is not sufficient to prove only that defendant had knowledge that another person was going to commit the crimes charged.  The State must prove *that it was defendant's conscious object that the specific conduct charged be committed*."  (Lin, 10-5491, ECF No. 2-71 at 87–92) (emphasis added).  Thus, because the trial court did not lift the burden of proof on an essential element of the offenses charged, Petitioner has failed to show that he is entitled to relief on this claim.

## V.    CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003); see also Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further and a certificate of appealability is denied.

## VI.   <u>CONCLUSION</u>

For the reasons stated above, the Petition for habeas relief is DENIED and Petitioner is

DENIED a certificate of appealability.  An appropriate order follows.


Dated**:** May 22, 2018                                      /s Stanley R. Chesler_____
                                                                  Stanley R. Chesler
                                                                  United States District Judge

42